STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-1113

STATE OF LOUISIANA

VERSUS

JACKIE LYNN PRUITT AKA JACKIE L. PRUITT

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2016-281
HONORABLE MARTHA A. O'NEAL, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and
D. Kent Savoie, Judges.

**AFFIRMED.**

James R. Lestage
District Attorney – 36th Judicial District
Richard Alan Morton
Assistant District Attorney – 36th Judicial District
P. O. Box 99
DeRidder, LA 70634
Telephone:  (337) 463-5578
COUNSEL FOR:
    Plaintiff/Appellee – State of Louisiana

David L. Wallace
P. O. Box 489
DeRidder, LA 70634
Telephone:  (337) 462-0473
COUNSEL FOR:
    Defendant/Appellant - Jackie Lynn Pruitt aka Jackie L. Pruitt

**THIBODEAUX, Chief Judge.**

Defendant Jackie Lynn Pruitt was convicted of first degree murder of Sonya Ortego in violation of La.R.S. 14:30(A)(1) and was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. Defendant now appeals his conviction, alleging insufficiency of evidence. We affirm.

## I.

## ISSUES

We must consider whether the evidence was sufficient for a rational factfinder to find Defendant guilty beyond a reasonable doubt.

## II.

## FACTS AND PROCEDURAL HISTORY

Defendant was convicted of the crime of first degree murder of twenty-nine-year-old Sonya Ortego committed on March 24, 2016, at Dee's Motel in DeRidder. Defendant was tried by a twelve-person jury and was convicted with an eleven-to-one verdict. Defendant was sentenced to life imprisonment at hard labor without parole after the trial court denied his post-trial motions.

Shortly before noon on March 24, 2016, the owner of Dee's Motel, James Bethard, found Ms. Ortego dead in room 6 when he went to deliver fresh towels. After knocking a few times with no response, Mr. Bethard entered room 6 where he discovered Ms. Ortego face down on the floor and covered partially with a bedspread by the foot of the bed. Mr. Bethard tried tapping her foot and calf to wake her before he noticed blood by her head, and he left the room to call 911.

Beauregard Parish Sheriff Deputies Michael Daniel Rick and Scott Greenum arrived shortly after noon, followed thereafter by Acadian Ambulance. The paramedics noted that Ms. Ortego was already dead, but her body was still warm. Detectives began to interview witnesses and collect evidence at the scene.

Ms. Ortego and her fiancé Matthew Jantzen had lived together in room 6 at Dee's Motel since February 1, 2016 and paid the rent through March 25, 2016. Ms. Ortego was mentally impaired and did not complete high school. She was unemployed and received Social Security benefits for her mental limitations. Mr. Jantzen was working as a skidder operator for a logging crew. On the day of the murder, Mr. Jantzen and Ms. Ortego fought as they did sometimes. Another motel resident, Trollis Dillard, often went to bed around five in the morning and described himself as "basically like the security" at the motel. When he was about to go to bed on March 24, 2016, he heard some arguing and cursing. Mr. Dillard came out of his room and saw Mr. Jantzen and Ms. Ortego fighting, and saw "[Ms. Ortego] was putting it on him[,] and he was doing a lot of ducking." He noted Mr. Jantzen acted "scared, he was the one getting whooped." Mr. Dillard told Ms. Ortego to stop and she did. Mr. Dillard saw Ms. Ortego go back into her room and Mr. Jantzen left when his ride to work pulled up around that time.

Adrian Jerry McDonald worked with Mr. Jantzen for approximately six months prior to the murder. Mr. McDonald generally picked up Mr. Jantzen at Dee's Motel around 4:45 to 5:00 A.M., and their commute to the worksites took about thirty minutes. On the day of the murder, their work was rained out around noon. Mr. McDonald and Mr. Jantzen planned to go to Mr. McDonald's house to drop off his work truck and to cash their checks. However, when they passed Dee's Motel, they saw an ambulance and police cars so they stopped.

2

Mr. Jantzen testified that on the morning of the murder, he and Ms. Ortego argued because he made a noise which woke her up. Mr. Jantzen said she was easily upset and would start "screaming like she always did." When he left for work, Ms. Ortego "was still upset[,]" and they were sending each other text messages the entire time he was away until she stopped answering at 7:45 A.M. Mr. Jantzen sent a text at 7:57 A.M. which read, "Baby Are [sic] you okay" because she stopped answering his texts. Mr. Jantzen denied physical contact with Ms. Ortego that morning. Mr. Jantzen said that he and Ms. Ortego engaged in sexual relations around 7:00 P.M. on March 23, 2016, and she was not on her menstrual cycle.

On March 23, 2016, Defendant went to visit his cousin, Richard Daniel James, in the afternoon and asked for the number to Dee's Motel. Mr. James had not seen Defendant for nearly a year. Mr. James thought that Defendant may have been drinking, but "he wasn't drunk[.]" Defendant visited Mr. James for a couple of hours while he was waiting for someone to send him some money through Walmart. Defendant left around 6:00 or 7:00 P.M. and did not return. Mr. James had offered Defendant his couch, and he "said he might come back[.]" Defendant went to Dee's Motel on March 23, 2016, checked into room 7 and paid the twenty-five ($25) dollars to rent the room for one night.

Russell Longoria lived in room 8 at Dee's Motel from March of 2014 to March of 2017. On March 23, 2016, Mr. Longoria returned from work around 5:00 or 5:15 P.M. Room 7 had been empty for weeks, but was occupied that night. Mr. Longoria spoke to the man renting room 7 while they were outside, and the man was drinking what Mr. Longoria assumed to be vodka. The man finished one pint, throwing it into the back of his pickup truck, which was backed up to room 7.

3

He then took another full pint from his pocket and began to drink it. Mr. Longoria identified Defendant at trial as the man he saw that night. Mr. Longoria went to bed around 9:30 or 10:00 P.M. and did not hear anything because there is a storage room between rooms 7 and 8. On March 24, 2016, Mr. Longoria woke up around 6:30 A.M. and left for work around 7:30 A.M. He did not see or hear anything unusual. When he returned around 7:45 P.M., he saw crime scene tape set up around Dee's Motel.

At the time of the trial, Walter Wayne Hassien lived in room 5 at Dee's Motel for almost seven years. Mr. Hassien worked in the oil field and did repair work at the motel. He would keep his room while he would be gone for three to four months. On March 23, 2016, around 4:00 P.M., Mr. Hassien opened his door and saw Defendant who "had a little bottle of whiskey" in his hip pocket. Around 10:30 or 11:00 P.M., Defendant came by wanting a cigarette and had asked a few other rooms. Defendant was still drinking. At 3:30 to 4:00 A.M., Mr. Hassien wanted to go outside to smoke a cigarette, but he looked outside his window and Defendant "was standing at his door looking back up towards [sic] our rooms and stuff." Mr. Hassien stayed inside because he did not want to interact with Defendant, because "he didn't seem right, he didn't feel right." Around 6:00 A.M., Mr. Hassien got up and "heard a commotion" in room 6. He believed it was Ms. Ortego and Mr. Jantzen playing around, and he went back to bed. When Mr. Hassien awoke again later, he heard a banging noise which he described as "like they were trying to repair something they tore up." Mr. Hassien first testified that Michael Wallace[1] talked to Defendant around 10:00 A.M. on Thursday, March 24,

---

[1] Mr. Wallace died in an automobile accident at some point after the murder and before the trial.

2016. Mr. Wallace offered Defendant a job and Mr. Wallace told them that Defendant did not want a job. Mr. Hassien did not indicate to whom Mr. Wallace was telling about that interaction. Mr. Hassien saw Defendant loading his truck up before Mr. Hassien went back into his room. Around 10:30 A.M., Defendant left in his red truck. Mr. Hassien remembered Defendant was in a hurry when he was leaving Dee's Motel. Mr. Hassien told Mr. Bethard about the banging noise he heard, and Mr. Bethard asked him to go with him to the room. They found Ms. Ortego lying on the floor and saw blood on the wall and around her head.

Mr. Hassien testified that Ms. Ortego would usually open the door to her room around 10:00 or 10:30 A.M., sit on the bed, and play games on her phone. If she knew they were outside, she would open the door. Then she might close it around 3:00 P.M. At about 4:30 P.M., Ms. Ortego would usually stand in the doorway waiting for Mr. Jantzen.

Mr. Dillard woke up around 8:30 or 9:00 A.M. when Mr. Hassien asked if he wanted to have coffee. They were in Mr. Hassien's room along with Mr. Wallace until Mr. Bethard came to get them to go into Ms. Ortego's room. Mr. Dillard did not want to enter the room because he was afraid. When Mr. Dillard saw Ms. Ortego early that morning, she was wearing a blouse and shorts. However, when they found her body she was only partially clothed.

Mr. Dillard had spoken to Defendant on March 23, 2016, requesting that he park his truck "the long way." Mr. Dillard stated that after the police were called, he saw Defendant come out of his room without a shirt. Mr. Dillard said he was talking to Mr. Bethard and Mr. Hassien about the police being on their way and that Defendant "acted like he didn't know what was there . . . ."

5

On the night before the murder, Defendant went around the motel asking for a cigarette. Defendant asked Mr. Jantzen and Ms. Ortego because their door was open, and they said they did not smoke. Mr. Jantzen did not see Defendant again. Mr. Jantzen said Ms. Ortego complained of noises at the motel and worried about her safety at Dee's Motel. Ms. Ortego liked being reclusive at the motel and "didn't like anybody in her business." Ms. Ortego considered Mr. Dillard to be "in her business" when he told Ms. Ortego and Mr. Jantzen what to do or not to do.

Tommy Pruitt, Defendant's brother, was Defendant's only witness at trial. He testified that he did not know that his brother was coming to DeRidder for a court appearance on March 24, 2016. Defendant came to their mother's house around 10:00 A.M. but did not spend Wednesday night there "because he was court ordered not too [sic]." Mr. Pruitt described Defendant as calm, not anxious, and "didn't even think he was gonna [sic] get put in jail" when he went to court. Defendant washed some clothes at their mother's house, and their mother put them in the dryer and folded them after Defendant left. He said that Defendant did not appear to be drinking but "looked better than [Mr. Pruitt] had seen [Defendant] in a while" even though they had not seen him for at least a year.

Deputy Michael Daniel Rick of Beauregard Parish Sheriff's Office received the dispatch of an unconscious female at Dee's Motel around 11:45 A.M. He arrived at 11:56 A.M., finding Ms. Ortego lying face down in the bedroom corner, with a blanket draped over her. Deputy Rick was wearing gloves and did not check for a pulse because he saw no signs of lividity. Deputy Rick noted in retrospect he should have checked for a pulse because he possibly could have done something at that point. Deputy Rick, along with Deputy Scott Greenum, had been

6

in the room before Acadian Ambulance and the detectives arrived on the scene. Deputy Rick saw "blood on the walls and furniture" as he backed out to avoid contaminating the crime scene. Later, when Deputy Rick took photographs, he found what he believed to be two stab wounds between Ms. Ortego's shoulder blades. Deputy Rick was present at the crime scene for several hours, and placed crime scene tape around room 6 and the surrounding rooms.

Deputy Oscar Louis Lopez, Jr. of the Beauregard Parish Sheriff's Office responded to Dee's Motel, along with Detectives Matt Barrett, Bobbi Ripley, and Toree Jones, at 12:20 P.M. Deputy Lopez photographed and videotaped rooms 6 and 7. Deputy Lopez noted that the door to room 6 did not appear to be forced open. He found a side panel of a knife near Ms. Ortego's body that was covered in blood. Deputy Lopez testified that he could clearly see a knife wound.[2] In room 7, Deputy Lopez found a stained bath towel and a stained hand towel. Deputy Lopez and some detectives collected DNA swabs from the doorknob on the entrance to room 7, as well as from the sink in that room. Deputy Lopez handled the items while wearing gloves and placed them into evidence bags as someone else logged them.[3] The jury saw Deputy Lopez's video and photographs, which showed: bloodstained walls and bed sheets in room 6; the side panel of the knife; the sink which appeared as if someone had tried to clean up blood; and a stain on the wall which looked diluted.

---

[2] However, the coroner, Dr. Terry Welke, was unable to determine what kind of instrument inflicted Ms. Ortego's wounds.

[3] Deputy Lopez's testimony about the swabs is difficult to decipher. His comment was, "Okay. The second one that I hope it works the same, but it's only a piece of it. The stake without the swab itself. The slow is what they use at the crime lab and then they are no good anymore[,] so they don't through the back in there."

Deputies noted that Ms. Ortego's body was found clothed in a shirt and socks, but no underwear. Panties were found near the doorway. No feminine hygiene products were found. No barbed wire was found in either room or Defendant's truck.[4] Deputy Lopez did not fingerprint anything in the room. He found room 7 "was fairly clean" with just "the dirty towels inside of the restroom."

Detective Herford and Deputy Franks entered room 7 which appeared clean except for some bathroom towels. The Sheriff's Department applied Blue Star,[5] a chemical used to identify the presence of blood, to the Defendant's room and Deputy Lopez took photographs of "[w]here the [B]lue [S]tar activated" next to the bed, near the front door, the floor by the restroom, the sink, the soap dish, and on the shower wall.[6]

Detective Mark Herford testified as the chief detective for the Beauregard Parish Sheriff's Office. After receiving a call about an unresponsive woman at Dee's Motel with blood inside the room, he sent a "mass text" to his detectives to meet at the scene. The detectives were able to contact all the residents of the motel except Defendant. One of the deputies on the scene knew where Defendant's mother lived so a deputy drove by to see if he could locate Defendant's red pickup truck. Deputy V.J. Franks was able to locate Defendant

[4]Defendant attributed scratches on his upper body to his recent work with barbed wire for a fencing company.

[5]Blue Star also reacts to other substances, but Deputy Lopez did not know what other substances. Additionally, Blue Star does not indicate for how long a substance it has highlighted has been present.

[6]The Beauregard Parish Sheriff's Department had Blue Star which had expired. They obtained current Blue Star from the Calcasieu Parish Sheriff's Office and followed the written instructions. Deputy Franks testified that they only read instructions on how to mix the Blue Star, but not all of the instructions. Detective Herford did not think the Sheriff's Office had ever used Blue Star. The Beauregard Parish Sheriff's Department did not have the photography equipment to take pictures showing the illumination.

and brought him to the Sheriff's Office, the courtroom, and then to the jail. Defendant went to court for a probation violation and was sentenced to thirty days in jail. Detective Herford interviewed Mr. Dillard and Mr. Hassien. He reported the death to the coroner and requested an autopsy and sexual assault kit.

Detective Morton received a call on March 24, 2016, from Deputy Herford about an unconscious woman at Dee's Motel. He volunteered to be the lead case agent. Detective Morton arrived to an already secured crime scene and saw a female lying face down with a bed comforter over her. She was wearing socks and had a shirt pulled over her head. There was a lot of blood and "what looked like a couple [of] stab wounds to her back[.]" Detective Morton spoke to Mr. Bethard, Mr. Dillard, Mr. Hassien, and Mr. Wallace. Detective Morton learned that Defendant left Dee's Motel around 10:30 A.M. in a hurry without a shirt on and "had some scratches and scars on him."

Deputy Franks left the scene to find Defendant. Deputy Franks found Defendant at the address that Deputy Franks was provided by another deputy. He observed that Defendant did not appear rushed as he left the residence and headed to the courthouse. Deputy Franks followed Defendant in his "semi marked unit" and asked Defendant if he would go to the Sheriff's Office to speak to detectives about the incident. Defendant said he had a court appearance at 1:30 P.M. Deputy Franks said he would contact the court to make arrangements, so Defendant agreed but did not ask why the detectives wanted to talk to him. Deputy Doyle took Defendant to the Sheriff's Office while Deputy Franks stayed with Defendant's truck. Additionally, Defendant's red truck was seized and placed in a secure

9

location until a warrant was issued.[7] Deputy Franks noticed luggage in the front seat that looked like a duffel bag, and totes and plastic garbage bags in the back—all visible from the window and in the bed of the truck. Deputy Franks also noticed "specks or smudges that were a brownish color" which looked like fingerprints on the door handle.[8] The next morning, when Deputy Franks arrived where Defendant's truck was being stored, Detectives Morton, Lopez, and Leedom were searching Defendant's truck and going through the duffel bag and luggage.

Detective Morton returned to the Sheriff's Office to interview Defendant. Defendant was read and waived his *Miranda* rights.[9] Detective Morton interviewed Defendant for about an hour. Defendant was not under arrest for this crime at the time of this interview.

Defendant asked why he was being interviewed. Defendant told Detective Morton that he had left Winnsboro where he was at a rehabilitation unit to attend court in DeRidder. Defendant knew he might receive jail time, and he thought he would be put on a payment plan after his court appearance. Defendant stated he hardly ever drank when working but would drink enough to help him fall sleep.

Detective Morton told Defendant that something happened to the woman in room 6, and Defendant asked if he had talked to her boyfriend. When Detective Morton told Defendant that "the total picture" implicated him as a person of interest, he agreed to give DNA, blood samples, and a suspect sexual assault kit. Defendant requested a lawyer.

---

[7]The warrant also included room 7 at Dee's Motel.

[8]The record does not indicate that the smudges were ever collected or tested even though Deputy Franks thought it was DNA evidence.

[9]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

Detective Morton obtained buccal swabs from Defendant and photographed him without his shirt. Defendant had a mark or scratch on his left upper chest, fresh scratches/marks on his upper torso, and a mark on his back "in a V pattern." Additionally, Defendant had a fresh scratch under his right armpit, and scratches on both sides of his front abdomen. Detective Morton thought one mark was a bite mark. However, neither the coroner nor the Sexual Assault Nurse Examiner (SANE) could positively confirm this was a bite mark. Defendant had three different lines along his right rib cage going towards the right shoulder which Detective Morton believed to look "like a scratch and claw mark[.]"

Defendant explained these scratches as injuries from working with barbed wire fencing for a fencing company in Winnsboro. However, Detective Morton thought the injuries were too fresh to fit the timeframe for Defendant's employment. Similarly, Defendant told the SANE nurse that the injuries were from barbed wire. The nurse also found what appeared to be "fresh dry blood" on Defendant's right knee, and she took a swab of it.

Detective Morton took additional photographs on March 28, 2016, to show the progression of the scratches he saw on March 24, 2016. He noted the injuries had "start[ed] to turn kinda [sic] a yellow and bruise." A third set of photographs was taken by Detective Morton on April 1, 2016, and he stated, "you couldn't hardly even see them . . . they had healed by that time."

Detective Morton was unable to recover anything from Defendant's mesh laundry bag left at his mother's house. The clothes had already been washed and dried. The detectives searched Defendant's truck on March 25, 2016, and found multiple bags and totes. The detectives found a black duffel bag on the passenger's side of the truck which contained a black cell phone. Additionally, the

11

bag contained: two First National Bank debit cards, one in Ms. Ortego's name and one in Mr. Jantzen's name; Ms. Ortego's prepaid Visa card; a temporary checkbook with Ms. Ortego's name, checking account, and bank routing number handwritten on it; and a prepaid phone. The prepaid phone matched the Defendant's purchase of a phone at Walmart like he told detectives. The bag also contained clothing and personal hygiene items. When detectives turned on the black cell phone found in the duffel bag, a photo of Mr. Jantzen showed up as the screensaver/background. Missed calls and text messages came through and matched the text messages from Mr. Jantzen's phone. On the phone there was a text from Ms. Ortego to Mr. Jantzen which he read at 7:22 A.M. that said, "okay, well it's pouring down here and remember that guy that got here last night came around asking for a cigarette but Mr. Wayne [Hassien] gave him one?" Mr. Jantzen responded but did not comment on the man, saying, "I see, well it's dry here, darling." The last text from Ms. Ortego was at 7:45 A.M. and then after that "everything was coming from [Mr. Jantzen's] to [the victim's] phone" according to Detective Morton.

During a second recorded statement, on March 25, 2016, at 5:53 P.M., Detective Morton advised Defendant that he was under arrest and charged with first degree murder. Defendant replied that Detective Morton never said anything about murder and he "thought she was hurt." Then Defendant admitted to Detective Morton that "there's a couple of things I didn't tell you but I mean I didn't think it was something that serious." Defendant said:

> The one thing I, I almost told you last night but I said no if I tell him it's going just to incriminate me and that was the morning I got up and left and went to packing my stuff, putting it in the truck, in the bed of my truck was a cell phone and couple of credit cards. I

> didn't even think nothing about it, I picked them up and put them in my bag. Last night I got to thinking about it, thinking this could be a problem and, but I never said anything to you about it, I said no I'm just going to, cause I know you going to find out anyway, who did it belong to?

Then Defendant said "something [] actually went down that night" but he wanted a lawyer.

At trial, Detective Morton showed text messages on Mr. Jantzen's cell phone from March 23, 2016 from 6:05 P.M. to 6:13 P.M., 8:28 P.M. to 8:39 P.M., and 11:12 P.M. to 11:17 P.M. The texts between Mr. Jantzen and Ms. Ortego discussed weather, food, getting married, and a possible move to Motel 6.

Detective Morton testified that Defendant became a person of interest because a witness described him as jittery, shirtless, and scratched when he was leaving the motel at 10:45 A.M. Detective Morton was familiar with Ronald Ortego, Ms. Ortego's brother who suffered from mental disability and schizophrenia. However, after the detectives found Ms. Ortego's and Mr. Jantzen's property in Defendant's truck, they did not spend much time on other possible suspects. Mr. Jantzen was interviewed via video, but it was not transcribed. Detectives did not take fingerprints from room 6 because they felt DNA was easier for results. Detectives also did not feel the need to search the other rooms at Dee's Motel. Detective Morton did not believe that the stain that Deputy Franks saw on Defendant's truck door was blood, so he did not have it swabbed or use Blue Star on it. Detective Morton found no evidence, nor did he gain any information to point to other suspects so his focus remained on Defendant from March 25, 2016 onward.

Not all seized items were submitted to the crime lab for analysis because the crime lab limits the number of submissions—generally a limit of six to seven items. The knife side panel was not submitted because law enforcement believed the blood it was covered in was the victim's as it was found close to the victim who was also covered in blood.

Defendant testified before a grand jury on May 4, 2016, and his testimony was read to the jury at trial. Defendant was read and waived his *Miranda* rights, and appeared with counsel. Defendant testified that he was on probation for a third offense DWI in August 2015 when he got intoxicated and had to serve ninety days in jail. He then went to Fresh Start Rehabilitation program in Winnsboro. On Wednesday, March 23, 2016, Defendant came to Beauregard Parish for a court proceeding on March 24. Upon arrival in DeRidder, Defendant went to Dee's Motel and put a room on hold for nine ($9) dollars. Defendant then went to his cousin's house to visit while he waited for a MoneyGram to be sent to him at Walmart which included the money he needed for the remainder of his stay at the motel. Defendant went to Walmart and then back to Dee's Motel, paying the balance on the twenty-five ($25) dollar room rate.

Shortly thereafter, around 6:00 to 6:30 P.M., Defendant began drinking two pints of vodka. Defendant asked for a cigarette from some of the motel guests who had their motel room doors opened, including Mr. Jantzen and Ms. Ortego. According to Defendant, at around 8:00 P.M. the woman in the next room knocked on his door and seemed "pretty aggravated" and "upset." She told Defendant her boyfriend just left with someone, and she propositioned him for sex. Defendant agreed, and they attempted to have sex, falling to the floor a few times. However, Defendant could not achieve an erection, but said, "[He] felt sorry for

14

the girl so [he] started using [his] fingers." Defendant claimed Ms. Ortego was on her menstrual cycle so they ended their sexual encounter. Defendant stated she got dressed and went to her room and he "washed [his] hands off and got back in bed and finished [his] vodka." He thought he passed out as he usually does when he drinks. He woke up "before daylight" the next morning because they were "hollering and screaming" next door. He was "a little worried" that maybe Mr. Jantzen had learned that Ms. Ortego had come to Defendant's room. He said he was still under the effects of vodka so he rolled over and went back to sleep. Defendant woke up again around 9:00 A.M., packed his truck, and headed to visit his mother and brother. Defendant claims that as he was packing up his truck, he noticed a cell phone and credit cards lying in the bed of the truck. Defendant stated he did not know how the items got there but he was "kinda [sic] in a hurry" so he put the items in the duffel bag. He said he did not mention finding the items or his sexual encounter with Ms. Ortego during the first interview with Det. Morton because he was embarrassed.

Defendant did not shower while at Dee's Motel but put on different clothes, although he was only partially dressed when loading his truck. He spoke to a man who offered him a job and he told him that he needed to be in court, but he might be interested if he did not go to jail. He wrote down the man's phone number. He went to his mother's house, washed his clothes, and left to go to court.

Upon parking, Defendant was surrounded by deputies, and he agreed to go with them when they said they would take care of his court appearance. Defendant gave a statement to Detective Morton, who also took photos of the scratches on Defendant's body which Defendant assumed "they come [sic] from the girl when [they] were rolling around on [his] bed and falling off on the floor . .

15

. .” Defendant also stated he had "a lot of scars from building barbwire fences." Defendant did not tell Detective Morton about his sexual encounter with the woman. Defendant denied killing the woman to the grand jury. However, Defendant admitted to blacking out and "not always remember[ing] everything when he was drunk on vodka[.]"

At trial, the foreman of the fencing company, David Brent, testified that they hired men from the Fresh Start Outreach Ministries that Defendant was enrolled in. The fencing company hired Defendant in 2014 or 2015. He went back to jail for ninety days, went through the Fresh Start program, and was re-hired when he reached the work phase of the program in late 2015. Mr. Brent said that Defendant had a bad attitude the first time, even before he started drinking again, but his attitude changed the second time. Mr. Brent stated that Defendant stopped working for the company in March 2016 because of his drinking problem. Furthermore, Mr. Brent said the company last worked with barbed wire jobs on January 13, 2016. He had no knowledge of any other barbed wire jobs after that date. Mr. Brent also mentioned that in the three years that he had been working on fencing, he did not have any scars from his work. He saw Defendant around town for roughly ten to fourteen days after he stopped working for the fencing company but believed "all he was doing was drinking." Mr. Brent did not think that Defendant could have done any fencing work around town without him knowing about it.

Dr. Terry Welke, a coroner with the Calcasieu Parish Coroner's Office, performed an autopsy of the victim on March 25, 2016. Dr. Welke found bruises on the victim's right upper and lower eyelid that was "fairly recent[,]" her nose was scraped, and her right cheek had "some straight injuries . . . consistent

16

with some sort of sharp instrument, usually a pointed type of instrument that scrapes." The victim had injuries to the left of her mouth. There were cuts made by a sharp instrument on her right ear, toward the top of her nose, and a wider scrape on her right cheek. A stab wound to the victim's neck cut a blood vessel. The victim had another cut underneath her chin and injuries to her scalp. She also had a cut behind her ear lobe and to the back of her ear. She had stab wounds close together with one wound having a sharp edge with a blunted top part "consistent with a knife or something to that sort." Dr. Welke identified stab wounds on the victim's neck, upper chest, back, along with superficial cuts, and scrapes on the back and shoulder. The victim also had defensive wounds on her right elbow, back of her right mid-forearm, and on the top of her left thumb. The victim also had wounds on her left arm. All of the victim's wounds were from the waist up, with the lowest wounds on her hands. Dr. Welke testified that the wounds were consistent with a single-edged blade like a pocket knife. Dr. Welke said there were too many cuts to count on the victim and her encounter with her attacker would have been prolonged and painful. A blow to her face caused swelling under her eye—possibly knocked her unconscious. Dr. Welke said that the cause of death was homicide from multiple stab wounds.

Dr. Welke also reviewed the photographs taken of Defendant on the day of the murder. Dr. Welke believed the scratches on Defendant's body were recent because they were red. Dr. Welke thought that the scratches "could be due to fingernails or some blunt instrument of some sort" because of their width. Dr. Welke did not believe that these scratches were consistent with scratches from barbed wire. Dr. Welke noted that he was from Nebraska and had been scratched by barbed wire and because barbed wire is essentially "a nail that's been twisted

around a piece of wire" it would leave a scratch mark narrower than the scratches found on Defendant. When Dr. Welke reviewed the photographs of Defendant taken on March 24, March 28, and April 1, 2016, he stated that the scratches were "consistent with resolving injur[i]es that occurred about a week prior or whatever."

Jade Marler, a SANE nurse, testified that she collected a suspect sexual assault kit from Defendant. He explained his scratches as the result of barbed wire fencing that he had worked with when employed with the fencing company. Ms. Marler found a puncture wound on Defendant's hand with brightness, and multiple lacerations on his fingers—those appeared to be healing. On Defendant's forearms were scratches with redness, which Ms. Marler believed indicated a fresh injury. When Ms. Marler asked Defendant about the redness on his inner elbow and the two marks on his right inner bicep, he did not answer. Ms. Marler noted newer injuries on his fingers which were oozing "the clear type [of] fluid after you hurt yourself." Defendant did not answer again regarding redness on his forearm, bicep, and lower back. Regarding three linear marks on his right upper back, Defendant "stuttered twice, stopped and then did not answer." Then Defendant paused for a long time and responded, "the fence job." Ms. Marler documented multiple bruised and marked areas on Defendant's chest. Ms. Marler also noted dried blood on Defendant's right knee but found that there was no scratch under this blood once she swabbed the blood. Ms. Marler collected Defendant's socks and underwear, fingernail swabs from both hands, saliva swabs, penile swabs, dry secretions from the chest area, probable dried blood from the right knee, and several tubes of blood as evidence.

Chris Singletary, a forensic DNA analyst at the Southwest Louisiana Crime Lab, testified at trial. Mr. Singletary analyzed the items submitted and

18

found blood in the swabs taken from stains on Defendant's knee, Defendant's underwear, and one of the towels. A DNA sample from the large towel matched the victim's DNA. An additional sample from the same towel showed DNA from two contributors with the victim as the major contributor. The minor profile on the towel was not enough for information. A DNA profile of Defendant was developed from his blood sample. Mr. Singletary matched the victim's DNA and Defendant's DNA to the DNA on Defendant's penile swab. The DNA profile of the victim also matched the swab taken from Defendant's knee. The swab from the motel sink in Defendant's room was "too complex to interpret" and the DNA from the doorknob only yielded a partial profile. Two DNA swabs from Defendant's underwear contained mixed DNA profiles and were also too complex to interpret. The swabs of possible dried secretions from Defendant's chest showed a mixed DNA profile with a major and minor contributor but the minor contributor was not enough for comparison. Mr. Singletary's work was reviewed by another analyst who agreed with the findings.

## III.

## <u>STANDARDS OF REVIEW</u>

When evaluating whether a conviction was supported by sufficient evidence, "a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).

"If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post-verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense." La.Code Crim.P. art. 821(E).

## IV.

## <u>LAW AND DISCUSSION</u>

Defendant alleges that the evidence was insufficient for a rational factfinder to find him guilty beyond a reasonable doubt. Defendant argues that the State has no murder weapon, no eye witness, and no evidence that he committed any type of felony against Ms. Ortego. Defendant asserts that all of the statements and testimony provided by Defendant was given prior to Defendant's attorneys receiving any discovery information from the State and before Defendant knew anything about the evidence. Defendant claims the case was a rush to judgment because Defendant was the only motel occupant that left the next day and the Sheriff's Office followed him and brought him in for questioning that day. Defendant further argues that the State presented witnesses which did not carry their burden of proof, collectively or individually. Defendant notes that several witnesses overheard commotion coming from Ms. Ortego's and Mr. Jantzen's room in the early morning hours and that the phone messages sent from Ms. Ortego's phone did not mean that she was alive or that she was the individual sending those messages. Moreover, Defendant states that the coroner opined that the wounds were caused by a single sharp edge, but there was no evidence to compare to determine the instrument which inflicted Ms. Ortego's wounds.

Defendant states that nobody explored Ms. Ortego's schizophrenic brother, Ronald, as a person of interest despite their history of physical altercations. Defendant takes issue with Detective Morton as the lead detective and a testifying witness because Richard Morton, his father, was the prosecutor examining Defendant for the duration of his testimony. Additionally, fifty-three items of evidence were collected and only seven items were tested. Defendant asserts that his sexual encounter with Ms. Ortego while she was on her menstrual cycle was a reasonable explanation for the little evidence that the State had tying Defendant to the crime. Defendant argues that other than him having the credit cards and phone of Ms. Ortego and allegedly her DNA on a towel in his room, nothing else links Defendant to Ms. Ortego's death.

The State argues that the evidence offered at trial proved beyond a reasonable doubt that Defendant was guilty of first degree murder of Ms. Ortego which occurred during the commission of other serious crimes: aggravated burglary, aggravated rape/first degree rape, and armed robbery. Although Ms. Ortego and Mr. Jantzen argued that morning, witnesses saw Ms. Ortego go back into her room and watched Mr. Jantzen get in his ride to work, and the couple continued to text throughout the morning. Further, witnesses noticed Defendant leaving Dee's Motel around 10:30 A.M. in a hurry, shirtless, and with scratches on his upper body. Defendant tried to account for the scratches by saying he received them while working with barbed wire fencing. The State argues that the jury clearly did not believe this explanation because Defendant's foreman at the fencing company testified that Defendant had not worked with barbed wire for weeks and the SANE nurse, Ms. Marler testified that the wounds looked fresh. Moreover, the State notes that a search of Defendant's truck resulted in detectives finding luggage

21

with Ms. Ortego's and Mr. Jantzen's possessions. The State alleges that Defendant realized overnight that officers would search his truck and came up with a story that he found the items tossed into the bed of his truck even though the items were inside his luggage in the cab of his truck. The State argues that the jury could have considered that as evidence of intentional misrepresentation and consciousness of guilt. Defendant testified to the grand jury and admitted during his testimony that he received copies of his offense reports and lab reports before his grand jury testimony. The State argues that the trial jury concluded that Defendant had again lied in an attempt to explain away evidence, contributing to the totality of evidence of his guilt.

Defendant was convicted of first degree murder. Under La.R.S. 14:30(A):

> First degree murder is the killing of a human being:
>
> (1) When the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of . . . aggravated or first degree rape, forcible or second degree rape, aggravated burglary, armed robbery . . . .

Louisiana Revised Statutes 14:60(A) reads, in pertinent part:

> Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstances:
>
> (1) If the offender is armed with a dangerous weapon.
>
> (2) If, after entering, the offender arms himself with a dangerous weapon.

(3) If the offender commits a battery upon any person while in such place, or in entering or leaving such place.

Under La.R.S. 14:42(A), in pertinent part:

First degree rape is a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it was committed under any one or more of the following circumstances:

(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.

(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

. . . .

(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.

Louisiana Revised Statutes 14:64(A) reads, "Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."

Under *Jackson v. Virginia*, the Supreme Court considers "whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." 443 U.S. at 313 (citing *In re Winship*, 397 U.S. 358 (1970)). In *State v. Captville*, 448 So.2d 676 (La.1984), the Louisiana Supreme Court held that the evidence was sufficient to support the defendant's conviction of

23

second degree murder. In *Captville*, trial testimony contradicted the defendant's account and "adamant denial that he handled the gun, [which] could have led the jurors to reasonably conclude that defendant put the gun next to the dying woman in an effort to support a concocted story of accidental discharge." *Id.* at 680. The court noted, "the jurors obviously (and reasonably) concluded that defendant's version of the events immediately preceding the fatal shot was a fabrication designed to deflect blame from him." *Id.*

An appellate court may impinge on the factfinder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of the law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). When a "jury reasonably rejects the hypothesis of innocence presented by the defendant[], that hypothesis fails, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *Captville*, 448 So.2d at 680.

We conclude that the evidence is sufficient for a jury to have found Defendant guilty beyond a reasonable doubt of first degree murder. Witness testimony established that there was a loud banging from room 6 after Mr. Jantzen left for work. The evidence suggests that the murder occurred between 7:45 A.M. and 10:00 A.M. during the time Defendant was at Dee's Motel. When Defendant spoke to Detective Morton the first time, he omitted evidence about finding the phone and credit cards in his truck. It was only during Defendant's second interview with Detective Morton and after he learned that he was a person of interest that he admitted that he had those items. Further, Defendant did not mention that he had a sexual encounter with the victim until his grand jury testimony. During his grand jury testimony, Defendant testified that he had seen

24

the offense reports and discovery. The record provided during discovery showed the preliminary autopsy report, the SANE report, police reports, witness statements, crime lab reports, and the results of the search warrants. The jury could have reasonably concluded that Defendant knew the victim's blood and DNA had been found in his room. Although Defendant claims Ms. Ortego was on her menstrual cycle, Mr. Jantzen testified that Ms. Ortego was not on her menstrual period at the time and no feminine hygiene products were found in Ms. Ortego's room. When the victim was found, she was found unclothed from the waist down, and her DNA was on Defendant's penile swabs which suggests that aggravated rape occurred in conjunction with the attack on the victim. Moreover, Defendant had possession of the victim's property, indicating the crime of aggravated burglary. The evidence also showed the victim was stabbed and had multiple lacerations from some type of weapon, indicative of armed robbery. Blood was found in both the victim's room and Defendant's room. Defendant had scratches on his upper body, hands, and forearms. Defendant attributed these fresh scratches to his work with barbed wire fencing. However, the testimony from the foreman of the fencing company that Defendant worked for did not corroborate that Defendant had worked with barbed wire fencing for months before the murder.

Although the evidence was mostly circumstantial, it was sufficient for a jury to find Defendant guilty beyond a reasonable doubt. Therefore, we affirm Defendant's conviction for first degree murder and his mandatory life sentence without benefit of parole, probation, or suspension of sentence.

## V.

## **CONCLUSION**

For the reasons set forth above, this court finds the evidence was sufficient to convict Defendant Jackie Lynn Pruitt of first degree murder. This court affirms Defendant's conviction and sentence.

**AFFIRMED.**